BOBBY M. & KAY C. SMITH, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
SMITH v. COMMISSIONER
Docket No. 22184-89
United States Tax Court
T.C. Memo 1991-412; 1991 Tax Ct. Memo LEXIS 433; 62 T.C.M. (CCH) 573; T.C.M. (RIA) 91412; August 21, 1991, Filed *433 S. Dennis Joiner, for the petitioners. Helen C. T. Smith, for the respondent. PARKER, Judge. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION This case is before us on petitioners' motion to enforce settlement, filed on January 11, 1991. Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended and in effect for the taxable years in issue. FINDINGS OF FACT On September 12, 1990, this case was noticed for trial during the trial session of the Tax Court in Jackson, Mississippi, commencing February 11, 1991. On January 11, 1991, the instant motion was filed. An evidentiary hearing on the motion was held in Jackson, Mississippi on February 11, 1991, at which time witnesses testified and documents were stipulated into evidence. The Internal Revenue Service (IRS) investigated petitioners for potential criminal violations related to their income tax returns for the years 1981 through 1984, inclusive. While the Federal Government eventually prosecuted petitioner Bobby M. Smith (hereinafter petitioner husband), it did not prosecute petitioner Kay C. Smith (hereinafter petitioner wife). On November 29, 1988, in the criminal case of *434 United States of America v. Bobby M. Smith, Case No. E88-00005(L), the United States District Court for the Southern District of Mississippi recorded a verdict of guilty as to count three -- violation of section 7201 (tax evasion) for 1983 -- and not guilty as to counts one (1981), two (1982), and four (1984). For the conviction on count three, the court sentenced petitioner husband to five years' incarceration, with four and one-half of those years suspended. The sentence further provided that upon his release from prison petitioner husband would be placed on probation for five years and must cooperate with the IRS and pay all taxes due and owing. The court fined petitioner husband $ 5,000 and required him to pay the costs of prosecution in the amount of $ 2,998.22. While taxpayers are under criminal investigation or prosecution, the Quality Assurance Staff in the Jackson, Mississippi, District Director's Office uses a fraud suspense program to monitor civil limitations periods in regard to civil tax liabilities. When the Quality Assurance Staff receives notification of such a criminal case, it reviews the case files to determine whether the revenue agent's or tax auditor's *435 civil report is technically correct and sufficient. On instructions from the Criminal Investigation Division or the District Counsel's Office, the Quality Assurance Staff then sends the case files to the District Counsel's Office but keeps a skeleton file in order to monitor the civil limitations periods. Once the criminal case is concluded and the case file is returned to the Quality Assurance Staff, the case is then sent back to the group or agent whence it came for consideration of the civil tax liability and possible settlement. When petitioners' case file was returned to the Quality Assurance Staff, Revenue Agent/Senior Quality Analyst Richard White thereupon sent the 1981, 1983, and 1984 years to Revenue Agent Brenda Moss' group in Meridian, Mississippi. Moss had been involved in petitioner husband's criminal case and had testified at his trial. On June 14, 1989, the Jackson, Mississippi, District Director's Office mailed to petitioners a notice of deficiency in income taxes in the amount of $ 77,265.31 for their 1982 taxable year. The deficiency notice also included determinations of additions to petitioner husband's tax under section 6653(b)(1) ($ 38,632.66), section *436 6653(b)(2) (50 percent of the interest due on $ 77,265.31), and section 6661 ($ 19,316.33). The deficiency notice limited petitioner wife's liability to the $ 77,265.31 deficiency, plus the $ 19,316.33 addition to tax under section 6661. The deficiency notice listed Dennis Caranna, Chief of the Jackson District Quality Assurance Staff, as the "person to contact." On September 11, 1989, in response to the statutory notice of deficiency in their 1982 income taxes, petitioners petitioned this Court, placing all of the adjustments in the notice in issue. [1] This is the only deficiency notice issued for any of the years 1981 through 1984. Petitioners' attorney, S. Dennis Joiner, a former IRS employee, signed the petition on their behalf. On November 14, 1989, Appeals Officer T. Gary Stewart received petitioners' docketed case for consideration of settlement. On that same day Stewart wrote to Joiner to inform him that Appeals had received jurisdiction over the docketed case and would be contacting Joiner to schedule a meeting to discuss settlement possibilities. *437 Appeals Officer Stewart faced a difficulty with negotiating a settlement for the one docketed year: the Examination Division had made net worth computations for 1981 through 1984, and the figure for 1982 was dependent on the figure for 1981. The case file Stewart received for 1982 did not contain any Examination workpapers. In the normal course of business a net worth computation will involve several years, and there will be consolidated workpapers for those years. Stewart requested Revenue Agent Moss' net worth computations for 1981, 1983, and 1984, so that he could review them prior to meeting with Joiner to discuss settlement of the 1982 taxable year. On April 20, 1990, Appeals Officer Stewart met with Joiner and William Sykes. Sykes was an accountant and a former IRS revenue agent and special agent, who had earlier been retained to assist Charles Wright, the attorney representing petitioner husband during the criminal investigation and criminal trial. Apparently Sykes was assisting attorney Joiner in the civil tax matter. Petitioner husband was on probation, and one of the terms of his probation was that he cooperate with the IRS and pay all of his civil tax liability. *438 Sykes assisted Joiner in trying to settle petitioner husband's 1981 through 1984 tax years. Joiner and Sykes requested Stewart to settle all four years, but Stewart informed them that three of the years were not in Appeals and that he had no jurisdiction over them. Stewart would not have 1981, 1983, or 1984 under his jurisdiction unless they were closed out as unagreed in the Examination Division, where Moss was handling those years. Stewart told Joiner and Sykes that they could try to work out a settlement of the nondocketed years with Moss and that if they were successful, they could enter into a closing agreement for 1981 and 1984. [2] Stewart also informed Sykes and Joiner that the docketed year (1982) could be resolved in Appeals through the use of a stipulated decision. *439 Joiner, Sykes, and Moss ultimately reached an understanding as to the proper deficiencies and additions for petitioner husband for 1981, 1983, and 1984, and also reached agreement as to innocent spouse treatment for petitioner wife. The settlement proposal was that after certain modifications to Moss' net worth computations made during the criminal trial, petitioner husband would concede the underlying deficiencies, plus the fraud addition and the understatement addition for 1983, but would agree to the negligence additions for 1981 and 1984 and the understatement addition for 1984, while petitioner wife would receive innocent spouse treatment for all three years. Moss informed petitioners' representatives that acceptance of the proposal would be conditional upon the District Counsel's approval. [3]
*440 The IRS had not issued deficiency notices or assessed the tax for 1981 and 1984 within the three-year period of limitations of section 6501(a) and had not obtained consents extending the limitations period, so without proof of fraud, assessment would be barred. Stewart informed Moss of the statute of limitations problem and told her that a settlement proposing to eliminate the fraud addition for 1981 and 1984 would require a closing agreement. Moss did not know how to draft a closing agreement to protect against the bar of the statute of limitations. Stewart agreed to assist Moss by drafting any closing agreement that she might work out with petitioners. On June 15, 1990, Revenue Agent Moss sent a handwritten note to Joiner to inform him that she had recently spoken with Stewart who had told her that the proposed settlement agreement would not be binding without a closing agreement. Moss also noted that she was sending a copy of her enclosed letter to Stewart so that he could draft the closing agreement for her. Moss' note to Joiner had an attachment. Page 1 of the attachment was Moss' typed letter of June 14, 1990, to Joiner detailing the taxes, interest, and additions due *441 from petitioner husband for 1981, 1983, and 1984. The June 14, 1990 letter stated that if the case were agreed, the negligence addition would be considered for 1981 and 1984, but that in any event the civil fraud addition would be proposed for 1983. Page two of the attachment was a Form 870, Waiver of Restrictions on Assessment and Collection of Deficiency in Tax, that Moss had prepared. The Form 870 reflected the figures for taxes, interest, and additions shown on Moss' letter of June 14, 1990. Moss had handwritten on the Form 870 the adjustment to income for 1982, $ 128,667.50. Moss included this figure on the form, because she wanted to notify Joiner that Stewart was going to use it to arrive at a settlement position for 1982. As noted above, Moss had adjusted the figures used in the original net worth computations, and an adjustment to the net worth computations for one year would result in an adjustment in subsequent years. Because of the interrelationship of the computations, Stewart would rely on Moss' figures. Moss' June 14, 1990 letter to Joiner stated that if Joiner agreed to the proposed tax increases for 1981, 1983, and 1984, he should sign the Form 870 and return *442 it to Moss. The June 14, 1990, letter also informed Joiner that Stewart would forward to him a "waiver" for 1982 along with the closing agreement. On July 5, 1990, Joiner wrote to Moss to memorialize two telephone conversations of July 3, 1990, and July 5, 1990. Joiner's letter stated that he and Sykes were now in a position where they could agree to the proposed taxes, additions, and interest on behalf of petitioner husband in order to close his case. The letter reflected Joiner's understanding that Moss wanted to close petitioners' case in the Examination Division, either agreed or unagreed, immediately. Joiner informed Moss that the Form 870 was presently in his office awaiting petitioner husband's signature and that Wright had authorized the use of Wright's office as the place where petitioner husband would come to execute the Form 870. Joiner stated his understanding that Moss would prepare an original Form 870 reflecting the agreed figures and would deliver it to Wright's office. Wright's staff would then call petitioner husband to come in to execute the Form 870 that same afternoon. Wright was not actually involved in negotiating the terms of the proposed settlement *443 of the civil tax liability. Joiner stated that after he received the executed Form 870 he would discuss further with Moss the assessment and the remaining closing agreement to be prepared by Stewart. Also on July 5, 1990, petitioner husband executed a Form 870 which was identical in all respects to the Form 870 Moss had transmitted to Joiner on June 15, 1990, with one exception: the last column of the executed Form 870 reflected additions under section 6653(a)(2). Petitioner husband had crossed out and initialed the last entry for 1981 but had left the entries for 1983 and 1984 unchanged; he crossed out the reference to section 6653(a)(2) for 1981 because he did not agree that section 6653(a)(2) applied in 1981. Otherwise, the Form 870 was unaltered. The Form 870 reflects the fraud addition in 1983, the negligence additions in 1981 and 1984, and substantial understatement additions for 1983 and 1984. The form contains no provision for the signature of the Commissioner or his delegate. Petitioner husband signed the consent to assessment and collection which reads as follows: I consent to the immediate assessment and collection of any deficiencies (increase in tax and penalties) *444 * * * shown above, plus any interest provided by law. I understand that by signing this waiver, I will not be able to contest these years in the United States Tax Court, unless additional deficiencies are determined for these years.
Neither Joiner's letter transmitting the executed Form 870 to Moss nor the executed Form 870 itself placed any conditions or restrictions on petitioner husband's consent to assessment and collection of the taxes and additions for 1981, 1983, and 1984. Stewart indeed assisted Moss by drafting the proposed closing agreement for 1981 and 1984. He received by telephone the information he incorporated into the proposal. On July 11, 1990, Stewart wrote to Joiner and sent him a proposed closing agreement intended to reflect the understanding reached between petitioners' representatives and Moss. Stewart had prepared the proposal for petitioner husband's signature alone (rather than for both spouses) because of his understanding that Moss was recommending innocent spouse treatment for petitioner wife. Stewart directed Joiner to have petitioner husband sign the proposed closing agreement and return it to Stewart. Stewart wrote that he would review *445 the incoming agreement and send it to Moss' supervisor. From there, petitioners' file would go to Review (the Quality Assurance Staff) in Jackson for approval of the closing agreement. Stewart informed Joiner that if the District Director approved, the District Director would execute the closing agreement, and Joiner would receive an approved copy. See supra note 3. Stewart's letter concluded the discussion of the closing agreement with the statement that "Prior to that time [execution by the Jackson District Director], the case is not closed." In regard to his year Stewart wrote that he would follow Moss' conclusions (computations) in the docketed year; that Appeals had jurisdiction over the 1982 year; that it would be necessary to prepare a stipulated decision document for the 1982 year because that year was under the Tax Court's jurisdiction; and that he would contact Joiner to close the 1982 year. On July 12, 1990, petitioner husband signed Form 906, Closing Agreement on Final Determination Covering Specific Matters, covering petitioners' 1981 and 1984 taxable years. The Form 906 included the section 6653(a)(2) addition for 1981 that petitioner husband had stricken out *446 of the Form 870. In the form 906 petitioner husband agreed to waive the statute of limitations on assessment and collection. The agreement, if approved, would treat petitioner wife as an innocent spouse and would establish the following tax liability for petitioner husband: 1) for calendar year 1981 a deficiency in tax of $ 82,379, additions under section 6653(a)(1) and (2) of $ 4,119 and $ 66,852.26, respectively, and interest of $ 133,704.52 to July 15, 1990, plus additional interest and additional section 6653(a)(2) additions for any portion of the deficiency and additions remaining unpaid after July 15, 1990; 2) for calendar year 1984 a deficiency in tax of $ 38,062, additions under section 6653(a)(1) and (2) of $ 1,903 and $ 13,921.65, respectively, a $ 9,516 addition under section 6661(a), and interest of $ 27,843.30 to July 15, 1990, plus additional interest and additional section 6653(a)(2) additions for any portion of the deficiency and additions remaining unpaid after July 15, 1990. Later that same day, Joiner sent Stewart a letter with the closing agreement executed by petitioner husband attached. Joiner informed Stewart that other creditors were enrolling judgments *447 against petitioner husband and that it would be in the IRS' best interest to enroll its assessment in the appropriate county recording office as soon as possible. Also on July 12 and 13, 1990, respectively, Appeals Officer Stewart and Senior Quality Analyst White signed a statement attached to the proposed closing agreement recommending its acceptance. Stewart signed the document, certifying that he had prepared and reviewed it, while White signed it as a reviewing officer. The preparer's signature indicates that the preparer has reviewed the incoming document for any alterations and that the agreement is proper for approval by the Commissioner's delegate. Stewart and White did not have the authority to accept the closing agreement on the Commissioner's behalf. No one with authority to accept the closing agreement on the Commissioner's behalf ever signed it. That proposed closing agreement was the only closing agreement document ever drafted for 1981 and 1984. Revenue Agent Moss never represented to Joiner, Sykes, or Wright that she had the authority to either accept the proposed closing agreement for 1981 and 1984 on the Commissioner's behalf or to settle the 1982 year. In *448 fact, as stated above, Moss informed petitioners' representatives that acceptance of the agreement was conditional upon the District Counsel's approval. See supra note 3. Also, Stewart explained to Joiner that the District Director had to approve the closing agreement for 1981 and 1984; that Stewart could propose a settlement for 1982 but did not have authority to accept one on the Commissioner's behalf; and that acceptance of any proposal was dependent on the approval of both the District Counsel (due to the proposed removal of the fraud addition) and a higher authority in the Appeals Office. See supra note 3. Neither Joiner nor Sykes nor Wright told Moss, either orally or in writing, that petitioner husband's agreement to the terms in the Form 870 was contingent upon the Commissioner's acceptance of the proposed settlement for 1981 through 1984. When the case files for petitioners' 1981, 1983, and 1984 taxable years were returned to the Jackson District Director's Quality Assurance Staff, Senior Quality Analyst White telephoned Joiner to tell him that the Service would immediately assess the taxes for 1983 based on the Form 870, but that assessment of 1981 and 1984 *449 taxes would be delayed until the District Counsel's office had approved the proposed closing agreement. See supra note 3. The delay was due to the necessity for the closing agreement and the requirement that District Counsel approve the elimination of the fraud addition. Joiner did not object to the proposal to assess the 1983 taxes pending action on the other two years. Joiner told White that other creditors were obtaining judgments against petitioner husband and that the IRS should assess the other years quickly so that it could put a lien on petitioner husband's remaining assets. On July 17, 1990, White had petitioners' taxes for 1983 assessed and sent the 1981 and 1984 case files to District Counsel for approval of the closing agreement. Immediately following the assessment, in response to Joiner's warning about other creditors, White notified John Adair, an Advisor/Reviewer in the IRS's Special Procedures Section. In July or August of 1990, Adair directed the filing of an IRS notice of Federal tax lien pertaining to petitioner husband's 1983 taxable year. The Special Procedures staff gathered the necessary information, including the date of assessment and social security *450 number, and on August 6, 1990, at 11:50 a.m. the IRS recorded a notice of lien on all of petitioner husband's property and rights to property for $ 191,372.36 in unpaid income taxes for 1983 with the Chancery Clerk, Newton County, Decatur, Mississippi. The $ 191,372.36 included deficiency, additions to tax for fraud and substantial understatement, and interest to date for the 1983 year. In August of 1990, Senior Quality Analyst White received petitioners' case file along with a memorandum stating that the District Counsel did not concur in the proposed settlement. White sent the 1981 and 1984 case files back to Moss' group (just after Moss transferred to the Huntsville District) so that the group could revise the revenue agent's report and contact Joiner for further action. White did not contact Joiner to inform him of the rejection of the proposed settlement. Only 1981 and 1984 remained open in the Examination Division; petitioners' tax for 1983 had been assessed, and that year was closed in the Examination Division and was in the hands of the Collection Division. On September 3, 1990, the IRS wrote to petitioner husband to inform him of an overdue income tax liability for *451 1983 in the amount of $ 191,372.36, plus additional interest of $ 2,437.32. The IRS requested immediate payment of the liability and informed petitioner husband that it would take enforced collection action if payment were not forthcoming. On September 4, 1990, at 8:00 a.m. the IRS recorded a notice of lien on all of petitioner husband's property and rights to property for $ 191,372.36 in unpaid income taxes for 1983 with the Chancery Clerk, Scott County, Forest, Mississippi. On October 15, 1990, the IRS wrote to petitioner husband both to remind him of the earlier notice and his continued failure to satisfy his tax liability for the 1983 taxable year and to request payment. The letter warned petitioner husband that if payment were not forthcoming, the IRS would file further notices of Federal tax lien and seize his property, wages, or other assets to satisfy the unpaid tax. The letter listed $ 191,372.36 as the unpaid tax liability for 1983 and $ 5,201.61 as the additional interest due. On November 19, 1990, the IRS notified petitioner husband that it was delaying payment of the $ 8,750.36 refund requested in his 1989 tax return pending an inquiry to make sure that he did not *452 owe other Federal taxes. On November 26, 1990, the IRS sent petitioner husband a notice of its intent to levy upon and seize his property and property rights if he had not satisfied his tax liability of $ 191,372.36 and $ 7,705.17 additional interest for the 1983 taxable year within 30 days. The record does not indicate that petitioner husband had made any payments on this 1983 tax liability up to the time of the evidentiary hearing on the present motion. On November 2, 1990, Appeals Officer Stewart sent Joiner a form letter stating that since the parties had not reached an agreement to settle petitioners' docketed case, Appeals had referred it to District Counsel for trial preparation. Appeals routinely uses this letter when it forwards unsettled cases to District Counsel for trial preparation. This letter was Stewart's first notification to Joiner that the 1982 year would not be settled in Appeals. Stewart never drafted a proposed stipulated decision document for 1982. Neither Revenue Agent Moss nor Appeals Officer Stewart ever represented to petitioners' representatives that the proposed closing agreement had been accepted on the Commissioner's behalf. The record does not *453 indicate when or from whom Joiner learned of the disapproval of the proposed closing agreement for 1981 and 1984. At the time of the evidentiary hearing on the pending motion, no decision had yet been made as to whether or not to issue a statutory notice of deficiency to petitioners for the 1981 and 1984 taxable years. The parties have not filed a stipulated decision document with the Court for the 1982 tax year, nor have they orally stipulated in open court to a basis for settlement of this case. OPINION Petitioners ask the Court to enforce an alleged settlement agreement covering four years, including their 1982 taxable year. The only year for which respondent has determined a deficiency and issued a deficiency notice is 1982. Accordingly, if the Court finds the existence of an agreement covering all four years, the Court can enforce the agreement only for the year before it. [4]
*454 Even a settlement stipulation is a contract governed by principles of contract law. "A settlement stipulation is in all essential characteristics a mutual contract by which each party grants to the other a concession of some rights as a consideration for those secured and the settlement stipulation is entitled to all of the sanctity of any other contract." Saigh v. Commissioner, 26 T.C. 171, 177 (1956). See also United States v. ITT Continental Baking Co., 420 U.S. 223, 235-237, 43 L. Ed. 2d 148, 95 S. Ct. 926 (1975); United States v. Armour & Co., 402 U.S. 673, 681-682, 29 L. Ed. 2d 256, 91 S. Ct. 1752 (1971). General principles of contract law are applied in construing a settlement agreement. United States v. ITT Continental Baking Co., 420 U.S. at 238; Robbins Tire & Rubber Co. v. Commissioner, 52 T.C. 420, 435-436 (1969). Absent a formal executed contract document here, the pivotal inquiry is whether the facts show that the parties entered into a binding settlement agreement. [5] Whether the parties entered into a settlement contract depends on whether respondent accepted a settlement offer encompassing petitioners' 1982 taxable year. *455 The terms of petitioner husband's suspended sentence and probation required him to cooperate with the IRS and pay his civil tax liability for 1981, 1982, 1983, and 1984. After the issuance of the statutory notice of deficiency for 1982, petitioners' representatives, Joiner and Sykes, both former IRS employees, attempted to settle all four years in Appeals. Appeals Officer Stewart informed them that he had no jurisdiction over 1981, 1983, and 1984, and that to settle those years they would have to deal with Revenue Agent Moss. Moreover, Stewart could not work out a settlement for 1982 independently because the Examination Division had computed petitioner husband's tax liability for all four years using the net worth method. Stewart told petitioners' representatives that once they had worked out a basis for settlement of 1981, 1983, and 1984 in the Examination Division, Appeals could work on settling the 1982 year. Petitioners' representatives and Moss ultimately arrived at a proposal for settling the three years under Moss' jurisdiction. Moss then prepared a Form 870 which, once signed by the taxpayer, would waive the restrictions on assessment and collection of taxes for these *456 years. Appeals Officer Stewart informed Moss of the necessity for a closing agreement to avoid the bar of the statute of limitations due to the proposed elimination of the fraud additions in 1981 and 1984. Stewart agreed to assist Moss by drafting the proposed closing agreement. On June 15, 1990, Moss sent Joiner the Form 870 she had prepared and informed him that no settlement proposal would be binding without a closing agreement. Moss included a notation of the proposed liability for 1982 on the Form 870 to notify Joiner that Stewart would use that figure when he drafted a proposed stipulated settlement document for the docketed year, 1982. In his letter of July 5, 1990, Joiner stated his understanding that he would discuss the assessment and the closing agreement with Moss after petitioner husband signed the Form 870. Petitioner husband signed the Form 870 on the same day, and Joiner enclosed it in his letter to Moss. Although the Form 870 contained petitioner husband's handwritten strike out as to the section 6653(a)(2) addition for 1981, neither the Form 870 itself nor the letter transmitting it to Moss conditioned petitioner husband's waiver of the restrictions on assessment *457 and collection on respondent's acceptance of the proposed settlement for 1981 through 1984. Stewart drafted the proposed closing agreement to reflect the terms that petitioners' representatives and Moss had agreed upon. Stewart mailed the proposed closing agreement to Joiner on July 11, 1990, and in the letter transmitting it he told Joiner that the agreement's acceptance required the Jackson District Director's signature. Both Revenue Agent Moss and Appeals Officer Stewart informed petitioners' representatives that the agreement also required the District Counsel's approval. See supra note 3. Petitioner husband executed the proposed closing agreement on July 12, 1990, and Joiner sent it back to Stewart that same day. In his transmittal letter, Joiner informed Stewart that other creditors were enrolling judgments against petitioner husband and that it would be in the IRS' best interest to enroll its assessment in the appropriate county recording office as soon as possible. Senior Quality Analyst White telephoned Joiner and informed him that the 1983 year would be assessed immediately but that the assessment for 1981 and 1984 would have to await the Commissioner's acceptance *458 of the proposed closing agreement. Joiner did not object to the proposal to assess 1983 while awaiting acceptance of the closing agreement for the other two years. Ultimately, the District Counsel's Office rejected the proposed settlement and scuttled the proposed closing agreement. The proposed closing agreement was never signed by anyone authorized to sign on behalf of the Commissioner. A stipulated decision document for 1982 was never prepared. Revenue Agent Moss never represented to any of petitioners' representatives that she had the authority either to accept the proposed closing agreement for 1981 and 1984 on the Commissioner's behalf or to settle the 1982 year. Moreover, Appeals Officer Stewart explained to Joiner that he (Stewart) could propose a settlement for 1982 but did not have authority to accept one on the Commissioner's behalf, and that acceptance of any proposal was dependent on the approval of both the District Counsel (due to the proposed elimination of the fraud addition) and a higher authority in the Appeals Office. Petitioners argue that petitioner husband's execution of the Form 870, coupled with respondent's assessment of the 1983 taxes and ensuing *459 collection activity conclusively establish respondent's acceptance of a settlement offer covering 1981, 1982, 1983, and 1984. Respondent counters that no settlement documents were ever prepared or executed for 1982; that the Form 870 by itself did not constitute a settlement agreement for any of the years and was not itself contingent upon any such agreement; and that no authorized official ever accepted the proposed closing agreement on behalf of the Commissioner. For the reasons discussed below, we find that the Commissioner never accepted an offer to settle this docketed case. Pursuant to section 6213(d), an executed Form 870 effects a waiver of the section 6213(a) restriction on assessment and collection of a deficiency. When a taxpayer delivers an executed Form 870 to respondent, respondent may immediately assess the taxpayer for the taxable year of the deficiency. If notice and demand for payment are not made within 30 days after the filing of the Form 870, the waiver stops the running of interest on the deficiency until notice and demand for payment are made. Section 6601(c). Although a waiver generally precludes this Court's deficiency jurisdiction, the taxpayer may *460 after payment of the tax still file a claim for refund and, if the refund claim is denied, or if the Commissioner fails to take action on the claim within six months, litigate the merits of his tax liability in his local United States District Court or the United States Claims Court. Under section 7121 a taxpayer may enter into an agreement with the Secretary relating to the taxpayer's liability for any internal revenue tax for any period, and such a closing agreement will be final and conclusive in the absence of fraud, malfeasance, or misrepresentation of a material fact. The Secretary has delegated to the Commissioner the authority to enter into such closing agreements. [6] Paragraph 4 of Delegation Order No. 97 (Rev. 28), 54 Fed. Reg. 9118 (March 2, 1989), redelegates the Commissioner's authority to execute closing agreements in nondocketed cases to District Directors and both Chiefs and Associate Chiefs of Appeals Offices. Also, paragraph 8 of Delegation Order No. 97 authorizes District Directors to redelegate their paragraph 4 authority but not below the Chief, Quality Review Staff/Section with respect to all matters. Paragraph 5 of that same order delegates *461 authority to execute closing agreements on the Commissioner's behalf in docketed cases to Regional Counsel, and to Chiefs, Associate Chiefs and Team Chiefs of Appeals Offices. Execution of Form 906 by or on behalf of the taxpayer results in an offer to agree. Rev. Proc. 68-16, sec. 6.07, 1968-1 C.B. 770, 780. Execution on behalf of the Commissioner constitutes acceptance of the taxpayer's offer. Rev. Proc. 68-16, supra. An executed Form 870, however, is not a closing agreement under section 7121. C.H. Leavell & Co. v. Commissioner, 53 T.C. 426, 438-439 (1969); Dolan v. Commissioner, 44 T.C. 420, 432 (1965). Petitioners' representatives had negotiated a settlement proposal for 1981, 1983, and 1984 based on Moss' net worth computations. *462 The parties understood that if the Commissioner accepted this proposal, 1982 would be settled using the same net worth computations. Moss told Joiner that the proposed settlement for 1981 and 1984 would not be binding without a closing agreement. Petitioner husband executed the Form 870 without any restrictions or conditions. Petitioner husband could have placed conditions on the effectiveness of his waiver but did not, so it was effective immediately upon its delivery to Moss. See, e.g., Philadelphia & Reading Corp. v. Beck, 676 F.2d 1159, 1161, 1164 (7th Cir. 1982). When Senior Quality Analyst White received the executed Form 870, he telephoned Joiner to inform him that the 1983 tax would be assessed immediately, while assessments for 1981 and 1984 would be delayed until the Commissioner had accepted the proposed closing agreement. Joiner urged a quick assessment for the stated purpose of protecting the IRS. Such a quick assessment would also mean that satisfaction of any nondischargeable debt to the Federal Government, such as a tax liability involving fraud, would take priority over satisfaction of the dischargeable debts to petitioner husband's other *463 creditors. By assessing the 1983 tax, respondent neither accepted the proposed closing agreement for 1981 and 1984, nor accepted the overall proposal to settle all four years. Petitioners' representatives clearly wanted to negotiate a settlement proposal covering all four years with respondent's representatives. Upon petitioner husband's execution of the proposed closing agreement, an offer to settle all four years probably came into existence. However, no one with authority to accept the offer on the Commissioner's behalf ever executed the proposed closing agreement. No one with authority to accept the offer on the Commissioner's behalf ever executed or filed with the Court a stipulated decision document for 1982. The record as a whole establishes and we find that the parties never contracted to settle the 1982 taxable year. Petitioners argue in the alternative that even if the parties never entered into a settlement contract, respondent is nonetheless equitably estopped from reneging on the proposed settlement. Because of the "policy in favor of an efficient collection of the public revenue," this Court approaches "with utmost caution and restraint" any application of *464 the estoppel doctrine against respondent. Estate of Emerson v. Commissioner, 67 T.C. 612, 617 (1977). Petitioners bear the burden of proving the following elements to successfully invoke estoppel: (1) There must be a false representation or wrongful misleading silence; (2) the error must be in a statement of fact and not in an opinion or a statement of law; (3) the person claiming the benefits of estoppel must be ignorant of the true facts; and (4) he must be adversely affected by the acts or statements of the person against whom an estoppel is claimed. * * *
Estate of Emerson v. Commissioner, 67 T.C. at 617-618. See also Keado v. United States, 853 F.2d 1209, 1217-1218 (5th Cir. 1988). Petitioners have not drawn our attention to any misrepresentations by respondent's representatives. Petitioners state that Revenue Agent Moss and Appeals Officer Stewart told Joiner, Sykes, and Wright that all four years could be settled as one package. Petitioners contend that the statements of respondent's representatives were misrepresentations. These statements were neither statements of fact nor misrepresentations. *465 Petitioners' representatives knew that neither Revenue Agent Moss nor Appeals Officer Stewart nor Senior Quality Analyst White was authorized to approve a settlement agreement on behalf of the Commissioner. All four years could have been settled as one package if the proper higher authorities had accepted the settlement proposal. Moss, Stewart, and White could only recommend acceptance, and this they did. Petitioners allege no other misrepresentation by Examination, Appeals or District Counsel personnel, and having searched the entire record, we find none. Moreover, petitioners' representatives, Joiner and Sykes, had previously worked for the IRS and were, or should have been, aware of the limitations on the authority of the individuals with whom they negotiated. Petitioners' representatives were no doubt disappointed in the outcome of their settlement efforts, and probably so were Moss, Stewart, and White. Their hopes were dashed, but they were not misled. Accordingly, equitable estoppel is not an appropriate remedy here. Petitioners' motion will be denied. An appropriate order will be issued. Footnotes
1. We note that the petition did not raise any innocent spouse claim on behalf of petitioner Kay C. Smith.↩
2. No closing agreement would be necessary for 1983, because petitioner husband proposed to concede the fraud addition in that year. In any event, he was collaterally estopped by his conviction for tax evasion to deny fraud for 1983. Thus 1983 involved no statute of limitations problem. If the fraud additions were eliminated from the 1981 and 1984 years, there would be a limitations problem.↩
3. The District Director had delegated to the Chief of the Quality Assurance Staff (formerly the Quality Review Staff) her (the District Director's) authority to sign closing agreements on behalf of the Commissioner. Thus, Dennis Caranna, the Chief of the Quality Assurance Staff, was a person authorized to sign closing agreements. However, where there had been a criminal case, as here, and where any settlement proposed to eliminate the fraud addition, such settlement also had to be approved by the District Counsel. District Counsel approval was required in such cases for either settlements recommended by the Appeals Office or settlements recommended by the Examination Division.↩
4. Petitioners have requested the Court to enforce the agreement for their taxable years 1981, 1982, 1983, and 1984, but the Court has jurisdiction only over their 1982 taxable year. Section 6213(a) restrains respondent from assessing a deficiency for any given taxable year without first sending the taxpayer the notice of deficiency authorized in section 6212(a). Section 6214(a) authorizes the Court to redetermine the deficiency determined in respondent's notice, while section 6214(b) prohibits the Court from determining whether an underpayment or overpayment exists in any year other than the taxable year for which respondent has issued the notice and determined a deficiency. F.A. Gillespie Trust v. Commissioner, 21 T.C. 739, 742 (1954) (discussing section 272(g), section 6214(b)'s predecessor under 1939 Code); Meisel v. Commissioner, T.C. Memo 1966-142↩.
5. Respondent argues that the absence of a settlement stipulation, either a written stipulation filed with the Court or an oral stipulation read into the record, is dispositive of this issue. As discussed below, we find that the parties never entered into any settlement contract, either oral or written. Accordingly, we need not address the issue of whether a settlement agreement must in all cases be filed or read into the record to be enforceable.↩
6. Section 7851(b)(3); Treas. Dept. Order No. 150-32, 1953 CCH par. 3592, 1953 P-H par. 76,756; Treas. Dept. Order No. 150-36, 1954-2 C.B. 733↩.